UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

ARTHUR REID,

                Plaintiff,

     -against-                                      04 Civ. 8873 (CM)

AETNA LIFE INSURANCE CO.,

                Defendants.
----------------------------------------------------------x

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION

McMahon, J:

Introduction

Plaintiff, a computer programmer analyst at a computer consulting firm, became unable to work and went on long-term disability in February 2000, after complaining of chest pains and blackouts brought on by work-related stress. Plaintiff was subsequently diagnosed with arterial clogging in his chest and legs and spinal compression, leading to pain symptoms in his knees, legs, and lower back. At the same time, Plaintiff underwent treatment for depression, memory loss and lowered cognitive functions, and symptoms of rage and anger.

The terms of the Plaintiff's long-term disability insurance plan stated that benefits for disability caused "to any extent" by mental or nervous causes would be terminated after twenty-four months. Defendant, pursuant to that plan, terminated benefits in February, 2002. Plaintiff sought and received a reconsideration of the termination; a final decision upholding termination

was made in May 2002.

Plaintiff brought suit under 29 U.S.C. § 1132, which enables civil actions for the enforcement of rights under an employee benefit plan covered by the Employee Retirement Income Security Act (ERISA). Upon submission of the administrative record and affidavits by both sides, Defendant moved for summary judgment. Plaintiff opposed and cross-moved for summary judgment as well.

For the reasons stated below, the Defendant's motion is GRANTED and Plaintiff's cross-motion is DENIED.

Facts

Plaintiff was employed as a computer programmer analyst and project manager at GRC International, a Virginia-based corporation which provides technical consulting services to the Department of Defense and other government agencies. AReid01313. Prior to his employment at GRC in February, 1997, Plaintiff had twenty-two years of experience as a programmer at IBM. Plaintiff's Opposition to Defendant's Motion for Summary Judgment and In Support of Cross-Motion for Summary Judgment (hereinafter, "Opposition") at 2. His work as a programmer analyst at GRC was described as 95% sedentary, with no lifting or pulling, and no exposure to dangerous materials. AReid01310. Prior to 1997, Plaintiff was relatively athletic and active, engaging in running, recreational basketball, and other activities. Areid00253. At the same time, he smoked two or more packs of cigarettes a day, had not had a physical examination in fifteen years, and appeared obese. Id.

Through GRC, Plaintiff was covered by a Group Life and Accident and Health Insurance Policy ("the Plan"), which included long-term disability coverage, provided by Aetna Life Insurance Co. (hereinafter, "Defendant"). See Affidavit of Maria Piotrowski (hereinafter, "Affidavit") at ¶ 2 . The Plan is an "employee benefit plan" under the terms of the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1101(a) (2000). Disability for purposes of the Plan is defined as an incapacity, "solely because of injury or disease, to perform the material duties of your own occupation" for 36 months after the time of injury. Areid01641. After thirty-six months, a claimant must be shown to be unable to work in *any* reasonable occupation, solely due to illness or disease, to continue receiving benefits. Id. AReid01634,01642. However, long-term disability benefits could be terminated after twenty-four months if the disability is at that time caused to any extent by a mental condition.[1] AReid01642-01643.

The Plaintiff's medical history, largely undisputed, is as follows. In May 1997, Plaintiff first complained of pain in both legs brought on by extensive walking or playing basketball. Areid00262. This pain did not limit his range of joint motion. Id. He was referred to Dr. Louise Reynolds of Vienna Family Medicine, who diagnosed him as having claudication - a reduced flow of blood to the legs caused by arterial clogging. The patient attempted chelation treatment - ingestion of the chemical EDTA to increase blood flow without surgery.[2] Areid00253. In addition, he was diagnosed with high cholesterol and non-insulin dependent diabetes mellitus,

---

[1]There is a further sub-exception for hospitalized claimants, not relevant here.

[2]Although not necessarily relevant, this Court takes note of the fact that chelation treatment for arterial diseases was, and remains, an experimental if not controversial technique.

which he sought to control with prescription medications. Id. Furthermore, Dr. Reynolds issued the Plaintiff a prescription for a nicotine patch to control his cigarette addiction. Id.

Initially, the Plaintiff did not fully cooperate with his medication regimen. Areid00249-00252. He did not begin to use the patch, "intermittently" took medication for cholesterol, and possibly ceased taking the prescribed diabetes medication. Areid00248. By late 1998, although the initial symptoms of leg pain had decreased, he reported new pain in the ball of his left foot. AReid00245. He treated the pain with prescription ibuprofen. Areid00242. In mid-1999, the symptoms of foot pain apparently re-appeared, and were re-treated with ibuprofen by a Dr. Cecil. Areid00242 There is no record of the Plaintiff's raising his prior issues of high cholesterol or diabetes at this visit. Id.

In late 1999, Plaintiff, now a GRC project manager, was asked to terminate two individuals under his employ as a cost-cutting measure, a request which apparently caused him a significant amount of stress and confusion. Areid00889. In October, he began to suffer from chest pains, burning sensations in his left arm, and numbness. AReid00240. On November 8, 1999, after Plaintiff had fired one employee, GRC notified him that he would also be let go. Areid00889. That event triggered increased chest pain and an intense blackout; he was admitted to the emergency room at Fairfax Inova Hospital complaining of chest pain, numbness, and tenderness in the rib cage. Areid00379. A thallium scan detected possible inferior ischemia - reduced blood flow to the heart. Id. Further analysis based on a November 11th catheterization probe of his chest detected significant plaque in the left coronary system, and a possible lesion in the right coronary artery. Areid01236. The Plaintiff opted in favor of non-invasive treatment rather than an angioplasty at this time. Areid01237.

As a result of his hospitalization, Plaintiff came under the care of Dr. Kerry Prewitt for care of the pain in his legs. His initial report notes that Plaintiff was still unable to walk more than one or two blocks before onset of pain. Areid00075. On January 14 and 21, 2000, successive femoral angioplasties were performed on the Plaintiff's right and left legs to address the reduced blood flow. Areid00114. The therapeutic effect of the angioplasties was limited - Plaintiff returned with complaints of pain in his legs and left foot almost immediately afterwards. Areid00112. Dr. Prewitt, at that time, concluded that the new symptoms were not the product of claudication. Id.

Plaintiff subsequently sought treatment from Dr. Bruce Smith, who evaluated the Plaintiff and diagnosed a herniated disk in his back and compression of the spine. Areid00154. This finding was confirmed by a September 18, 2000, MRI, which detected disk herniation and mild stenosis - painful pressure on the spinal nerves by vertebrae. Areid00160. Dr. Smith also noted how Plaintiff's ongoing depression constituted a risk factor and could affect his ability to interact with physicians. Areid00154. At this point, Plaintiff agreed to wait before moving to consultation with an orthopedic surgeon. Id.

In a June 2000 letter, Dr. Prewitt indicated that the Plaintiff's leg pain had spread, and now occurred while Plaintiff was immobile. Areid00162. He also noted Plaintiff's unease with the length of time the visit required, difficulty in remembering drug dosages and prior diagnoses, and interest in chelation therapy rather than repeated angiograms or angioplasties. Id.

By August, 2000, Plaintiff had come under the care of Dr. James Melisi, a neurosurgeon. Dr. Melisi's complete file is not included in the record provided. Opposition at 7. It appears, however, that in May 2001, Dr. Melisi scheduled Plaintiff for a laminectomy - surgery on the

vertebrae to remove pressure on the spinal nerves. Areid00063. This operation was aborted after a pre-operative screening detected Plaintiff's blood sugar level at over 600. Id. A pre-operative report, dated May 7, 2000, by Dr. Harvey Sherber, notes normal electrocardiogram results and some walking ability. AReid00055-00058. Dr. Sherber also noted concern for Plaintiff's long-term cardiovascular health. The laminectomy was successfully performed two months later, and post-operative MRIs indicated a clean prognosis and no need for additional spinal surgery. Areid00597.

Beginning in April 2001, Plaintiff complained of new pain in his knee joints. He was referred to Dr. Christopher Annunziato, who treated him with lidocaine injections in late April, 2001. Areid00743. When these injections did not arrest the Plaintiff's symptoms, he opted to undergo arthroscopic surgery on his right knee on August 20, 2001. Areid00738. Similar surgery was planned for the left knee, although never completed. Opposition at 9.

The arthroscopic surgery apparently had minimal impact on the Plaintiff's pain symptoms. In his last patient report, Dr. Annunziata observed continued pain, although also noted a range of knee movement of up to 120 degrees. Areid00734. Plaintiff entered physical therapy at Phyllis Moriarty & Associates in January, 2002. His initial consultation showed intense lower back and rear pain, limited leaning ability, and difficulty sleeping on his back. Areid00674. Although it is not clear how long he attended physical therapy, records indicate approximately a month of constant attendance. Areid00677-00678. He subsequently began treatment with Dr. Michael Vierio, a chiropractor, on February 11, 2002. Opposition at 10. His records are not included in the file, although he submitted a note, stating the plaintiff was totally

disabled due to back pain, to the claims administrator.³ Areid00619.

*Psychological Treatment.*

In December 1999, after his initial hospitalization at Fairfax Inova, Plaintiff began to see Dr. Diane Milliken and Dr. Vell Rives - mental health providers at the North Virginia Psychiatric Group ("Nova") - for psychological evaluation and treatment. He was diagnosed with anger management and stress-related issues; symptoms of sleeplessness, memory loss and social uneasiness were noted. Areid00215-00220. He began taking Zoloft and Zyprexa for his psychological symptoms. Id. Although the initial report indicated only a 6-visit course of treatment, Id., he continued to see Dr. Rives for almost two years in total.

After his initial visits in 1999, Plaintiff began to develop new psychological difficulties. He reported increased depression, feelings of rage, and fear of being watched by large conspiracies. Areid00200-00203. The Plaintiff's statements indicated a fixation on work and the events of his firing, with alternating feelings of guilt, anger, and fear as a result. Id.

Depression, anxiety, paranoia, and sleep disorders continued through 2000, with some improvement noted by September, 2000. Areid00192-00187. Plaintiff's mood at that point appeared to brighten, with less job-related obsession. Id. In September 2000, Dr. Rives completed a Mental Health Provider's Statement in September 2000, which noted no restrictions on Plaintiff, although he noted limited interpersonal skills with others and recommended that the Plaintiff not resume work until January, 2001. Areid00213.

---

³Subsequent to February, 2002, Plaintiff saw additional doctors and health professionals, including Dr. Robert Tomkins, a pain specialist, and Dr. Reza Nejad. This treatment, beginning in May 2002, was not considered by the claim examiner.

These observations were supported by the report of Claims Consultant Ron Hartleib, who interviewed Plaintiff in February, 2000, and noted that the Plaintiff was staying at home in the dark with the curtains drawn, and had difficulty remembering events and understanding questions. Areid01302-01306. A separate report by Dr. Harry DeVanney for the Virginia Department of Rehabilitative Services, performed on May 31, 2000, noted severe dysthymia (mild, long-term depression), generalized anxiety disorder with chest pain, impaired visual and verbal memories, and possible mild physical damage to the brain. Areid00889-00892.

The Plaintiff's post-1999 patient records from Nova are not in the administrative file. The next relevant document consists of a Mental Health Provider's Statement, dated November, 6, 2001 from Dr. Renee Payne, who apparently replaced Dr. Rives as Plaintiff's primary mental health provider. Dr. Payne's report deviates significantly from Dr. Rives' 2000 report. She found Plaintiff to be totally disabled, and noted a complete inability to perform almost any work-related task. Areid00032-00033. She further notes that Plaintiff was non-compliant in his treatment regimen, and suffered from anxiety, depressed mood, and "persecutory delusions." Id. She notes that she had been seeing Plaintiff every few months, but no description of the meetings, or reason for the decline in Plaintiff's well-being from the previous year, is provided. Id.

*Procedural History*

In April, 2000, Plaintiff was found to be eligible for long-term disability benefits, retroactive to February, 2000. Areid00335-00336. A letter dated April 19, 2000 confirmed this fact but did not provide any underlying medical reason. Id. It also stated that Plaintiff was

subject to periodic re-evaluation concerning his condition and continued disability. Id. Defendant apparently reviewed claimant medical history through "Attending Physician Statements" ("APSs"), completed by a claimant's treating physicians, and Mental Health Provider's Statements, completed by treating psychiatrists. Areid00008. The Defendant required claimants to distribute these forms to their health care professionals and solicit responses. Id. Defendant could also require an independent physical examination, although it argues claimants do not have a right to such an exam. See Areid00537.

On April 10, 2001, Defendant conducted a review of the file, and found Plaintiff disabled, subject to the mental/nervous policy limitation. Areid00066. At that time, investigators considered whether the Plaintiff's heart condition was a separate cause of total disability, which would have avoided the 24-month cap. Id. However, further investigation found that the condition was not disabling. Id. Defendant contacted the Plaintiff and alerted him to the possibility that his long-term disability benefits might be subject to the twenty-four month mental/nervous limitation. Areid00053. Plaintiff challenged this finding, apparently in the belief that the restriction applied to disabilities that were *only* mental in nature. Areid00052.

In late 2001, Defendant recommenced an investigation of Plaintiff's case, and in the process solicited statements from all Plaintiff's doctors and mental health providers. Areid00030. Reports were filed by Drs. Payne, Reynolds, Annunziata, and Melisi; all filed at least two separate reports or letters to Defendant between November and January. Affidavit ¶¶ 26-32. After considering these reports, Defendant decided to terminate benefits in February, 2002, after twenty-four months, on the grounds that Plaintiff's disability was caused in part by mental reasons. Id. ¶ 33. A letter communicating that fact was sent on February 4, 2002. Id., Areid00658

Plaintiff appealed this determination by letter on February 28, including with his letter two MRI reports related to his back, a Physical Therapy Status Report from Phyllis Moriarty and Associates, and a note from Dr. Michael Vierio, a Chiropractor, dated March 1, 2002 [sic]. Id. at ¶ 35. Plaintiff also had his more recent medical records, such as Dr. Annunziata's file, faxed to the Defendant as well. Areid00733-00746. Plaintiff also requested an independent physical examination, but was informed that such an examination was at the discretion of the Defendant only. Affidavit at ¶ 43. His file, including the newly submitted material, was reviewed by Dr. Joseph L. Braun, Defendant's Medical Consultant, and Maria Piotrowski, an Appeals Analyst, and the decision to terminate was re-affirmed in May. Id. at ¶¶ 1, 38. Subsequent appeals by the Plaintiff with further medical documentation, largely from new doctors, were unavailing.

Plaintiff subsequently complained to both the State of New York Insurance Department, Areid00440-00441, and the Virginia Department of Insurance Complaints. Areid00433. New York seems to have rejected Plaintiff's claim in October, 2002. Areid00969. Thereafter, Plaintiff brought suit against GRC and Aetna under the Employee Retirement Income Security Act (ERISA) on November 1, 2004. Complaint at ¶ 24. Plaintiff's claims against GRC have since been withdrawn, leaving Aetna as the remaining defendant.

Discussion.

ERISA provides a federal cause of action for an ERISA-covered insurance plan participant or beneficiary, "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of

the plan." 28 U.S.C. § 1132 (2000). "A denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 10 S. Ct. 948, 956-57, 103 L. Ed. 2d 80, (1989). The parties have agreed that the plan in question does not confer discretionary authority on Aetna, the claim fiduciary, to interpret its terms. Therefore, the determination of the administrator terminating Mr. Reid's benefits at the 24-month point is reviewed de novo.

*Determination to Expand the Record*

In the Second Circuit, de novo review of an ERISA claim determination "is limited to the record in front of the claims administrator unless the District Court finds good cause to consider additional evidence." DeFelice v. Am. Int'l Life Assurance Co. of N.Y., 112 F.3d 61, 67 (2d Cir. 1997). This good-cause requirement is not a per se rule permitting expansion of the record whenever a plan administrator or fiduciary acts as a claim examiner. See Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 296-297 (2d Cir. 2004). Rather, the claims procedure must be shown to be flawed or arbitrary. See id. The Second Circuit has not indicated a single test that determines the reliability of a claim procedure; however, lack of notice to the claimant as to the basis for an initial rejection, or denial of the claimant's right to submit new information in light of an initial rejection are significant factors in the analysis. See Juliano v. Health Maint. Org. of N.J., 221 F.3d 279, 289 (2d Cir. 2000); cf. Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125-126 (2d Cir. 2003) (finding process granting claimant, "ample time to submit additional materials" and involving some communication with one doctor sufficient to deny expansion of

the record). Furthermore, the court may not consider materials that arose after the time that the record was closed, absent a showing of bad faith or a conflict of interest. See id.; see also Salute v. Aetna Life Ins. Co., 2005 WL 1962254 at *6 (E.D.N.Y. Aug. 9, 2005).

Plaintiff has noted numerous gaps and absences in the administrative record that, he argues, call for a denial of summary judgment and an expansion of the factual record. Most significant is the absence of the records of Dr. Melisi, Inova Fairfax Hospital's records of Plaintiff's laminectomy, and the record of Plaintiff's post-laminectomy physical therapy.[4] Opposition at 22-23. Plaintiff further argues that he made the names of these professionals known to Defendant during its review, and provided releases such that the burden of acquiring the records fell on the investigator. Id. at 23.

The absence of such material does make the record of Plaintiff's treatment, especially in the second year of his disability, somewhat opaque. I note, however, that Plaintiff successfully sought and received the records of Dr. Annunziata, Phyllis Moriarty and Associates, and Dr. Payne's Mental Health Provider's Statement, on or around February 7, 2002, after the initial termination of benefits. Areid00724-00783, see also Areid00666 (discussing communications between Plaintiff, Plaintiff's doctors and Defendant in early February). Plaintiff continued to submit medical information throughout 2002. Since Plaintiff had sufficient time and knowledge to find and acquire these records, it is not clear why these other records, if relevant, could not have been acquired in the same manner. Furthermore, the records provided by the Plaintiff after the initial termination, taken with existing APSs and prior records already in Defendant's

---

[4]Defendant argues that some of these records were in fact considered. I assume for purposes of argument that certain significant records were omitted from the file.

possession, were hardly an inadequate basis for a reconsidered ruling. Therefore, mere absence of these records does not show that the claim procedure was flawed.

Plaintiff has also sought the inclusion of the records of Dr. Vierio, Dr. Nejad, and Dr. Alan Mogliner, materials apparently generated after the denial of benefits in February, 2002. Opposition at 23. As the Plaintiff himself notes, however, the relevant time period for consideration of a claimant's medical history is twenty-four months after the initial receipt of benefits. Id. at 14; see also Areid01642. Medical documentation generated after that time, especially documentation based on immediately present symptoms such as pain or lack of mobility, has nothing to do with whether Plaintiff's disability as of February 2002 was caused in part by psychological factors. Therefore, inclusion of such information from the factual record before the court would not assist this Court in its de novo review.

Plaintiff has also sought to add records about the investigation of Dr. Braun, Defendant's in-house claims reviewer. Opposition at 23. Dr. Braun, however, did not examine the Plaintiff at any time. He simply reviewed the administrative record and assisted in making a claims determination based on its contents. There is no reason to expand the record to include the inclusion of Dr. Braun's notes, if any exist.

Plaintiff submits that the disagreement between Dr. Braun's diagnosis and the prior diagnosis of Dr. Michael Mittelmann, also in the employ of Defendant, requires denial of summary judgment. Opposition at 18. However, these analyses were performed almost a year apart, and were based on different standards. Prior to the end of the twenty-four month period, the only relevant question for Dr. Mittelmann was whether the claimant was disabled for any reason. Dr. Braun undertook his review at a time when the issue was whether Plaintiff's

disability was caused to any extent by mental or nervous conditions. Therefore, any difference in the two physician's conclusions is irrelevant.

*Defendant's Motion for Summary Judgment*

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).

This standard is applied in light of the relevant language of the Plan. This language states that:

> a period of total disability will end after 24 monthly benefits are payable if it is determined that the disability is, at that time, caused <u>to any extent</u> by a mental condition... described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders.

Areid01642 (emphasis added).

Plaintiff argues that this language requires that a mental condition must itself be independently disabling at the time in question - a somewhat strange argument considering that such a conclusion is wholly supported by Dr. Payne's report. Opposition at 14. Defendant contends that the Plan cuts off benefits for "a claim caused even to a relatively modest degree by

a mental condition." Defendant's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment, at 10. Defendant is correct. As long as mental health issues contributed in some way to Plaintiff's inability to work, Defendant was within its rights in cutting off benefits.

In this case, there is no question that Plaintiff's mental impairments at the very least contributed to Plaintiff's inability to work as of February 2002. Plaintiff's own mental health doctor, Dr. Renee Payne, noted in her November 2001 Mental Health Provider's Statement that the plaintiff was "markedly limited" or "unable to perform" all work-related activities, including performing simple or complex tasks, following instructions, or interacting with others. Areid00032-00033. This determination seems to have been based solely on psychological factors. Id.

Plaintiff's health records from 1997 onwards do reveal that Plaintiff has had at least three separate strains of possibly debilitating physical ailments: (1) pain in his legs, lower back, knees, and feet, which were treated between 2000 and 2002 with angioplasties in both legs, arthroscopic surgery in one knee, and spinal laminectomy; (2) diabetes, which was treated with various medications beginning in 1997; and (3) chest pains or heart-related ailments, which appeared in late 1999, contemporaneously with his work-related stress. His most recent APSs and 2001 medical records indicate that the leg, foot and lower back pain constituted the most significant ailment prior to the twenty-four month cutoff.

There is no issue that Plaintiff suffered from multiple physical problems. However, the administrative record does not support a finding that Plaintiff's mental health issues did not contribute to his disability.

First, the Attending Physician Statements submitted in late 2001 by the Plaintiff's primary physicians - Drs. Melisi, Annunziata, and Reynolds - do not indicate that Plaintiff's pain or other physical conditions were independently disabling. Areid00003-00004, 00010-00011, 00039-00040. Dr. Melisi's & Dr. Reynolds' reports indicate that Plaintiff is "capable of clerical/administrative (sedentary) activity", and indicates only limitations on Plaintiff's lifting capability; Dr. Annunziata's report indicates "no limitation" on Plaintiff at all. Id.

Available medical records from late 2001 and early 2002, including the records of Dr. Annunziata and Phyllis Moriarty & Associates, the Plaintiff's own physical therapists, indicate that the Plaintiff had continued strength and range of motion in the afflicted joints and was capable of performing seated work, despite ongoing pain. Areid00733-00734, Areid00747-00755.

Dr. Reynolds provided a second APS on February 7, 2002, in which she re-diagnoses Plaintiff as "incapable of sedentary activity," noting "he is in pain all the time and can barely ambulate," and "anxiety and chest pain brought on by stressful conditions are incapacitating for him." Areid00724-00728. She defines "stressful conditions" as "interactions with his superiors at work." Id. This report states that the Plaintiff is newly disabled, but attributes his decline to stress as much as to an increase in pain symptoms.

For another, the Plaintiff's depression, although perhaps not the root cause of his pain symptoms, chest pain, or diabetes, contributed to the Plaintiff's apparent inability to take medication regularly or remain on a course of treatment. Depression was noted as a complicating factor in the Plaintiff's treatment in September 2000. Areid00154 ("I have discussed with him how [his depression] might impact both his symptoms and his interactions with physicians.").

disability.

As this Court recently held, attempts to reclassify a disability as physical in order to avoid a twenty-four month limitation should be closely scrutinized. See Bergquist v. Aetna U.S. Healthcare, 289 F. Supp. 2d 400, 412 (S.D.N.Y. 2003) (McMahon, J.). In this case, Plaintiff's prior submissions to Defendant, including his own request for reconsideration in February 2002, indicate that his inability to work was not solely physical. E.g., Areid00612-00614. Nothing in the record before me supports a conclusion that the Plaintiff's psychological issues, which contributed to the Plaintiff's disability in 2000 and 2001, ceased to be disabling in February, 2002. Since the Plan cut off benefits if the disability is caused even in part by mental factors, Plaintiff's claim for benefits must be denied.

## Conclusion

For the reasons discussed above, I grant the motion of Defendant Aetna Life Insurance Co. for summary judgment and deny the motion of Plaintiff Arthur Reid for summary judgment. The Clerk of the Court is directed to enter judgment for defendant, and to close the file.

This constitutes the decision and order of the Court.

Date: October 12, 2005

U.S.D.J.

BY FAX TO ALL COUNSEL